UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,        :

                                   05 Civ. 8912 (WCC)

               Plaintiff,    :

     - against -          :       **OPINION**
                                      **<u>AND ORDER</u>**

SALVATORE DiPAOLO, JR.,       :

              Defendant.   :

- - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                                 MICHAEL J. GARCIA
                                 UNITED STATES ATTORNEY FOR THE
                                 SOUTHERN DISTRICT OF NEW YORK
                                 **Attorneys for Plaintiff**
                                 U.S. Department of Justice
                                 86 Chambers Street
                                 New York, New York  10007

RUSSELL M. YANKWITT, ESQ.
  Asst. United States Attorney

       Of Counsel

                                 SALVATORE DiPAOLO, JR.
                                 **Defendant *Pro Se***
                                 One Dogwood Drive
                                 Scarsdale, New York 10583

**Copies  Mailed  to  Counsel  of  Record**

**Conner, Sr. D.J.:**

Plaintiff, the United States government, brings this action against defendant Salvatore DiPaolo, Jr. seeking injunctive relief and civil penalties for defendant's failure to comply with a final administrative order issued by the United States Environmental Protection Agency (the "EPA"). Specifically, defendant operated two underground diesel fuel storage tanks in Yonkers, New York, and upon the EPA's inspection of the tanks, it determined that defendant was in violation of the underground storage tank provisions of the Resource Conservation and Recovery Act and the Hazardous and Solid Waste Amendments of 1984 (the "RCRA"). The EPA thereafter filed an Administrative Complaint against defendant, and defendant requested a hearing on the EPA's charges against him. Defendant, however, failed to comply with all pre-hearing procedures and did not attend the administrative hearing. Accordingly, the Administrative Law Judge (the "ALJ") entered a default judgment against defendant assessing civil penalties of $80,317 and ordering him to comply with the EPA requirements applicable to underground storage tanks. To date, defendant has failed to pay the civil penalties and comply with the applicable EPA requirements. On October 20, 2005, plaintiff filed this action seeking the enforcement of the ALJ's Default Order, as well as civil penalties, authorized under the RCRA, not to exceed $32,500 for each day of defendant's continued noncompliance with the order and $11,000 per tank per day for his failure to provide information requested by the EPA regarding defendant's underground storage tanks. Defendant has not filed an answer or expressed an intention to do so. Plaintiff therefore requests that this Court enter default judgment against defendant seeking the relief requested in its Complaint. For the following reasons, plaintiff's motion is granted in part and denied in part.

1

## FACTUAL BACKGROUND

The following statement of the facts is based on the Complaint,[1] plaintiff's Declaration in Support of its Motion for Default Judgment, the EPA's Administrative Complaint and the Default Orders issued by the ALJ.  Defendant is the sole owner of a bus company that owns and previously operated two 3,000 gallon underground diesel fuel storage tanks which were installed in 1984.  (*See* Complt. ¶ 1; Pl. Decl. Supp. Mot. Default J. ¶ 24.)

> An underground storage tank system ("UST") is a tank and any underground piping connected to the tank that has at least 10 percent of its combined volume underground.  The federal UST regulations apply only to underground tanks and piping storing either petroleum or certain hazardous substances.  Until the mid-1980s, most USTs were made of bare steel, which is likely to corrode over time and allow UST contents to leak into the environment.  Faulty installation or inadequate operating and maintenance procedures also can cause USTs to release their contents into the environment.  The greatest potential hazard from a leaking UST is that the petroleum or other hazardous substance can seep into the soil and contaminate groundwater, the source of drinking water for nearly half of all Americans.  A leaking UST can present other health and environmental risks, including the potential for fire and explosion.  In 1984, Congress responded to the increasing threat to groundwater posed by leaking USTs by adding Subtitle I to the Resource Conservation and Recovery Act . . . . Subtitle I required EPA to develop a comprehensive regulatory program for USTs storing petroleum or certain hazardous substances.  Congress directed EPA to publish regulations that would require owners and operators of new tanks and tanks already in the ground to prevent, detect, and clean up releases.

Overview of the Federal Underground Storage Tank Program, http://www.epa.gov/OUST/overview.htm.

On June 21, 2001, May 21, 2002 and June 7, 2002, representatives of the EPA inspected the facility where defendant's tanks were located, and on March 31, 2003, the EPA issued defendant an

---

[1] *See Sony Music Entm't Inc. v. Pedestal Prods., Inc.*, No. 01 Civ. 4033, 2002 U.S. Dist. LEXIS 6662, at *2 (S.D.N.Y. Apr. 9, 2002) (accepting the plaintiff's well pleaded allegations concerning issues other than damages as true on a motion for default judgment).

Administrative Complaint and Notice of Opportunity for Hearing, citing various violations of the RCRA. (*See* Complt. ¶¶ 44-45; Pl. Decl. Supp. Mot. Default J. ¶ 6.) Specifically, the Administrative Complaint alleged that, pursuant to 40 C.F.R. Part 280 Subpart D, defendant "failed to provide a method or combination of methods of release detection for his two [underground storage tanks]" and "failed to satisfy the upgrade requirements (spill, overfill and corrosion protection) as set forth in 40 C.F.R. § 280.21" or, in the alternative, failed to close the underground storage tanks in accordance with 40 C.F.R. Part 280, subparts F and G. (*See* Complt. ¶¶ 36, 46.) Incidentally, the EPA's inspection did not reveal that defendant's tanks had leaked, and defendant asserts that they never have.

On May 30, 2003, in response to the Administrative Complaint, defendant filed an Answer and requested a hearing on the EPA's charges. (*See id.* at ¶ 47.) On July 18, 2003, the ALJ issued a Prehearing Order, setting forth a schedule for the filing of prehearing exchanges, as required under the applicable regulations. (*See id.* at ¶ 48.) On September 18, 2003, the EPA submitted its prehearing exchange, but defendant failed to submit his response or any statement in lieu thereof, thereby beginning a persistent pattern of default by defendant. (*See id.* at ¶ 49.) On November 13, 2003, the ALJ extended defendant's deadline to file a prehearing exchange to November 21, 2003. (*See id.* at ¶ 53.) Defendant was advised on multiple occasions that the failure to submit his prehearing exchange would result in a default judgment against him. (*See id.* at ¶ 54.) Nonetheless, defendant failed to file the exchange or to request an extension of time to do so. (*See id.* at ¶ 55.)

On February 23, 2004, the EPA served defendant with its motion for a default judgment. Defendant received copy of the motion, but failed to respond in any way. (*See id.* at ¶¶ 57-58.) On April 27, 2004, the ALJ issued a Default Order, finding that defendant had violated several EPA

requirements regarding underground storage tanks, and assessed against him civil penalties in the amount of $80,317, which were calculated in accordance with 42 U.S.C. § 6991e(d)(2) and applicable federal guidelines. (*See* Complt. ¶ 59.) The order required defendant to pay the civil penalties by August 28, 2004. (*See id.* at ¶ 67.) The ALJ concluded that a default judgment was appropriate because defendant offered no explanation for his failure to comply with prehearing exchanges or to show good cause why the default should not be issued. (*See id.* at ¶ 66.)

On May 5, 2004, the EPA filed a motion requesting that the ALJ modify its order requiring defendant to comply with the EPA's requirements regarding underground storage tanks. (*See id.* at ¶ 60.) Although defendant received the EPA's motion on May 11, 2004, he did not submit a response. (*See id.*) On May 24, 2004, the ALJ issued its "Addendum to Default Order," which required that defendant comply with release detection, upgrades and all UST requirements or, in the alternative, cease operation and permanently close all UST systems. (*See id.* at ¶ 61.) Because the EPA did not receive a receipt of service regarding either the April 27, 2004 Default Order or the May 24, 2004 Addendum to Default Order (collectively, the "Default Orders"), it again served them upon defendant by registered mail on June 9, 2004.   (*See id.* at ¶ 62.) Defendant did not appeal or otherwise respond to the orders, and, pursuant to 40 C.F.R. § 22.27(c), the Default Order and the Addendum to Default Order became effective as a final administrative order no later than July 29, 2004, forty-five days after it was served. (*See* Complt. ¶ 63.)

Defendant failed to pay the penalties and, on September 8, 2004, the EPA sent a notice of delinquency to defendant, which defendant received on September 13, 2004. (*See id.* at ¶ 68.) The notice demanded payment of the $80,317, plus accrued interest and handling charges from August 28, 2004. (*See id.*) To date, defendant has not paid the civil penalties or complied with the

4

requirements applicable to underground storage tanks, as ordered by the ALJ.  (*See id.* at ¶ 69.)  An EPA inspection on September 10, 2004 revealed continued noncompliance with federal release detection and upgrade requirements.  (*See id.* at  ¶ 71.)  During this inspection, defendant informed the EPA's inspectors that one tank was still operational and the other was out of service but not empty.  (*See id.* at ¶ 72.)  Pursuant to the EPA requirements, regardless of whether the tanks are operational, all underground storage tanks that are not empty must have a release-detection system. (*See id.*)

On December 3, 2004, the EPA sent defendant a "Request for Information" letter regarding defendant's tanks which required a response by January 7, 2005.  (*See id.* ¶ 75.)[2]  Although the EPA received the return receipt on December 8, 2004, evidencing defendant's receipt of the letter, defendant did not respond.  (*See id.*)  On February 7th and 9th of 2005, the EPA contacted defendant to inquire as to the status of defendant's response to the "Request for Information" letter, and on February 7, 2005, the EPA faxed defendant another copy of the Request.  (*See id.* at ¶ 76.)  Again, defendant did not respond.  (*See id.*)  Then, on February 23, 2005, the EPA sent a letter to defendant, advising him that his failure to respond to the "Request for Information" is a violation of the RCRA UST regulations and could result in penalties up to $11,000 per day for each tank.  (*See id.* at ¶ 77.) Defendant still did not respond.  (*See id.*)

In light of defendant's failure to comply with the ALJ's Default Orders and to respond to the EPA's "Requests for Information," plaintiff commenced the instant action on October 20, 2005.

_____

[2]  Pursuant to 42 U.S.C. § 6991d, "any owner or operator of an underground storage tank . . . shall upon request of any . . . representative of the [EPA] . . . furnish information relating to such tanks . . . ."

(*See id.* at ¶ 29.)[3]   The Complaint seeks judgment against defendant for civil penalties in the amount of $80,317, as assessed by the ALJ, plus an additional $32,500 for each day of defendant's continued noncompliance with the Default Orders, as well as $11,000 for each tank per day for his failure to provide information pursuant to the EPA's "Request for Information."  (*See generally* Complt.) Plaintiff also seeks an injunction ordering defendant to comply with the injunctive provisions of the Default Orders and to furnish the information requested by the EPA pursuant to its "Request for Information."  (*See generally id.*)[4]

We scheduled an initial conference on February 17, 2006 at which defendant appeared *pro se*.  The parties discussed settlement, and the government explained that it would not settle unless defendant submitted a financial disclosure form.  The Court ordered defendant to complete and submit a financial disclosure form by May 15, 2006, but defendant failed to do so.[5]  On May 22, 2006, defendant explained that he could not submit a financial disclosure form because he owed his accountant money, which he was unable to pay at that time.  The Court extended defendant's time to submit the financial disclosure form to the first week of July 2006 or, in the alternative, to answer the Complaint within 21 days thereafter.

On July 6, 2006, plaintiff received defendant's financial disclosure, which, according to

---

[3] Plaintiff served defendant with the Complaint on October 27, 2005.  (*See* Pl. Decl. Supp. Mot. Default J. ¶ 7.)

[4] *See* 42 U.S.C. § 6991e(a)(3), § 6991e(d)(2) (authorizing the relief requested by plaintiff).

[5] By letter dated March 1, 2006, Assistant United States Attorney ("AUSA") Russell M. Yankwitt reminded defendant to complete the financial disclosure form or answer the Complaint. (*See* Pl. Decl. Supp. Mot. Default J. ¶ 32.)   In this letter, AUSA Yankwitt also provided defendant with the applicable EPA guidelines to close the tanks, which, under the Default Orders, defendant was required to do unless he complied with the EPA's detection system and upgrade requirements. (*See id.*)

plaintiff, disclosed that defendant owned only one asset, a "pistol." Defendant claims, and plaintiff denies, that in addition to listing a pistol, defendant listed certain real estate on the form. On July 21, 2006, the Court held a settlement/status conference at which plaintiff stated that it would not settle the matter in light of defendant's failure to file an accurate financial disclosure. The Court therefore ordered defendant to answer the Complaint within 30 days of the conference and scheduled a discovery conference on December 11, 2006.

On August 28, 2006, plaintiff notified the Court that defendant failed to answer the Complaint and indicated that it intended to file a motion for a default judgment. Plaintiff ultimately filed the motion on September 13, 2006. Defendant was ordered to appear on October 13, 2006 and show cause why a default judgment should not be granted. Defendant did not appear. However, before this Court had entered a default judgment as a result of defendant's failure to show cause, defendant called chambers to explain his absence at the hearing. In response to defendant's request for an additional opportunity to show cause,[6] the Court scheduled a second hearing on December 1, 2006. On this date, both parties appeared and made oral argument. Defendant appeared *pro se* and did not indicate an intention to answer the Complaint at a future date. As a result, the December 1st hearing addressed the appropriate relief to be ordered in the event that the Court were to enter a default judgment against defendant. The Court took the parties' arguments under advisement, and is now prepared to resolve the issue.

_____

[6] As is routine for my chambers, my law clerk called the parties the day prior to the hearing to confirm its date and time. Although my law clerk called defendant on his cellular phone and left a voicemail message, defendant claimed that he did not receive the message until after the hearing.

## DISCUSSION

### I.   **Default Judgment**

Under FED. R. CIV. P. 55, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise," default judgment may be entered.  Indeed, "a party's default is deemed to constitute a concession of all well pleaded allegations of liability . . . ."  *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992), *cert. denied*, 506 U.S. 1080, 1080 (1993); *see also Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974) (same); *Directv, Inc. v. Cruz*, No. 503-CV-644, 2006 WL 3386774, at *1 (N.D.N.Y. Nov. 21, 2006) (same).  In the present case, the grounds for a default judgment are established by defendant's failure to answer the Complaint, particularly in light of the fact that he has expressed no intention to do so at a future time.  *See Trs. of the CWA Local 14156-Printers, Publishers & Media Workers Benefit Fund v. Rumar Typesetting & Design*, No. 05 Civ. 1455, 2006 WL 1227183, at *2 (S.D.N.Y. May 5, 2006) (finding that a default judgment was appropriate when the defendant did not answer the complaint and requested more time to appear).

However, because it is an extreme remedy, courts in this circuit have also considered three other factors when determining whether the entry of default judgment is warranted, namely: (1) "whether the defendant's default was willful; (2) whether [the] defendant has a meritorious defense to [the] plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment."  *Id.*; *see also S.E.C. v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998) (same); *Mason Tenders Dist. Council v. Duce Constr. Corp.*, No. 02 Civ. 9044, 2003 WL 1960584, at *2 (S.D.N.Y. Apr. 25, 2003) (same).  First, "[a]n entry of default

8

judgment should be made only where there [is] willful default, such that the failure to answer was more than mere negligence or carelessness." *Duce Constr.*, 2003 WL 1960584, at *2 (citing *McNulty*, 137 F.3d at 738). In the present case, plaintiff served defendant with the Complaint on October 27, 2005, and defendant has not yet answered despite this Court's order to do so. Moreover, defendant has received proper notice of two Order to Show Cause Hearings for Default Judgment, one of which defendant attended, and at no time has defendant expressed an intention to file an answer. This is all against a backdrop of defendant's repeated disregard for deadlines and requests of both the EPA and this Court, which exhibits flagrant disregard for the process of law and deliberate default. *See supra* pp. 5-7. *See McNulty*, 137 F.3d at 738 (finding the defendant's default willful when he received and acknowledged letters from the plaintiff reminding him to answer the Complaint but failed to do so); *Duce Constr.*, 2003 WL 1960584, at *2 (finding that the defendant's default was willful when it failed to make any appearance in the action and did not provide an explanation for such failure).

Second, defendant does not have a meritorious defense to plaintiff's claims. Defendant has admitted on several occasions in open court that he is not in compliance with applicable EPA requirements which are the subject of plaintiff's Complaint. His only defense concerns the level of civil penalties to be assessed against him and, in particular, his inability to pay the civil penalties of $80,317 previously imposed by the ALJ and sought, *inter alia*, in plaintiff's Complaint. Thus, with respect to liability, defendant has no meritorious defense and, indeed, no defense at all to plaintiff's claims. *See also Rumar Typesetting & Design*, 2006 WL 1227183, at *2 (granting a default judgment when the defendants did not file an answer and thus were deemed to have submitted no evidence of any defense).

9

Third, the denial of the present motion would cause substantial prejudice to the government, which has already expended significant resources in prosecuting its case at the administrative level and has received a favorable final administrative order against defendant.  Defendant, however, has completely disregarded that order, necessitating the filing of the present action in federal court. Defendant continues to evade responsibility for his admitted noncompliance with the applicable EPA requirements by not entering into an acceptable settlement agreement with the government or even filing an answer.  Accordingly, if we were to deny the government's motion, its admittedly valid claims would effectively be defeated.  *See Rumar Typesetting & Design*, 2006 WL 1227183, at *2 (finding that the denial of the plaintiff's motion for default judgment would be unduly prejudicial to the plaintiff as no additional steps were available to secure relief in that court).  Thus, given defendant's track record, denying the government's motion is not a viable option, particularly since it would create a perverse incentive for violators to disregard federal administrative orders. Accordingly, all three factors are met, and a default judgment must be entered against defendant as to liability.

## II.    __Damages__

"While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages."  *Greyhound Exhibitgroup*, 973 F.2d at 158; *see also Credit Lyonnais Sec. (USA), Inc., v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999); *Cruz*, 2006 WL 3386774, at *1.  A court cannot merely award the damages alleged in the complaint, but rather it must "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty."  *Alcantara*, 183 F.3d at 155; *see also Transatlantic Marine Claims Agency, Inc. v. Ace*

*Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997).  While FED. R. CIV. P. 55(b)(2) allows a court to

conduct a hearing on damages to determine the appropriate relief, one is not necessary if the court

is able to ensure from the circumstances that a reasonable "basis [exists] for the damages specified

in the default judgment."  *Ace Shipping*, 109 F.3d at 111; *see also Brigiotta's Farmland Produce &*

*Garden Ctr., Inc. v. Przykuta, Inc.*, No. 05-CV-273S, 2006 WL 3240729, at *1 (W.D.N.Y. July 13,

2006) ("A district court can make these determinations without a hearing so long as it ensures that

the pleadings and evidence submitted in support of the motion provide a basis for the default

judgment and the damages specified therein.").  As one court explained, "[t]he [c]ourt need not hold

a hearing [on damages] . . .  as long as it has (i) determined the proper rule for calculating damages

on the claim[;] and (ii) the plaintiff's evidence establishes, with reasonable certainty, the basis for

the damages specified in the default judgment . . . ."  *Sony Music Entm't*, 2002 U.S. Dist. LEXIS

6662, at *5.[7]

  In the present case, the record clearly establishes a basis for awarding damages with

reasonable certainty, and a damages hearing is therefore unnecessary.  In particular, the record

contains the ALJ's Default Orders assessing civil penalties against defendant in the amount of

$80,317 and ordering defendant to comply with all applicable environmental regulations.[8]  Plaintiff

---

[7] United States Magistrate Frank Maas's Report and Recommendation in *Sony Music Entertainment Inc.* was subsequently adopted by the Honorable Robert L. Carter, United States District Judge for the Southern District of New York.

[8] Specifically, the ALJ assessed civil penalties in accordance with 42 U.S.C. § 6991e and the U.S. EPA Penalty Guidance for Violations of UST Requirements, as amended by "Modifications to EPA Penalty Policies to implement the Civil Monetary Penalty Inflation Rule (pursuant to the Debt Collection Improvement Act of 1996)."  Pursuant to this statutory and regulatory framework, the ALJ considered defendant's background and actions, the environmental threat posed by the situation and the economic benefit derived by defendant from his violations.  He explained:

argues that "[t]his default order is entitled to preclusive effect in this Court under both *res judicata* and collateral estoppel principles." (Pl. Submission Supp. Mot. Default J., Ex. 1 at p. 1.) Although collateral estoppel cannot properly be applied in the present case,[9] we adopt the Default Order's assessment of civil penalties and grant of injunctive relief under the doctrine of *res judicata*.

Under federal law, the doctrine of *res judicata* provides that "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Saud v. The Bank of N.Y.*, 929 F.2d 916, 918 (2d Cir. 1991); *see also*

> The civil penalty proposed in the Complaint is consistent with the record in this proceeding and the statutory penalty criteria in Section 9006(a) of RCRA, 42 U.S.C. § 6991e(c). The Penalty Computation Worksheet attached to the Complaint and Complainant's Prehearing Exchange demonstrate that the penalty for [the violations] was calculated in accordance with the UST Penalty Policy by determining an economic benefit component to reflect the specific circumstances of the violation, the violator's background and actions, and the environmental threat posed by the situation. The proposed penalty of $80,317 is entirely reasonable given that Section 9006(d)(2) of RCRA provides that violators of UST requirements "shall be subject to a civil penalty not to exceed $10,000 for each tank for each day of violation." 42 U.S.C. § 6991e(d)(2).

(Pl. Submission Supp. Mot. Default J., Ex. 1, ex. D at p. 4.) Additionally, the ALJ ordered defendant (1) to comply with all applicable release detection requirements set forth in 40 C.F.R. Part 280, Subpart D, (2) to comply with all applicable requirements of 40 C.F.R. §§ 280.20-21 and (3) to comply with all other applicable requirements of 40 C.F.R. Part 280 for all UST systems owned and/or operated by defendant. (Pl. Submission Supp. Mot. Default J., Ex. 2 at p. 3.) In the alternative to the above orders numbered (1) - (3), the ALJ ordered defendant to immediately cease operation of and permanently close all UST systems owned and/or operated by defendant in accordance with 40 C.F.R. §§ 280.70-74. (*Id.*)

[9] "[T]he general rule is well-established that default judgments lack issue-preclusive effect." *In re Adler, Coleman Clearing Corp. v. Gurian*, No. 05-6245, 2006 WL 2374238, at *1 (2d Cir. Aug. 14, 2006) (citing *Abrams v. Interco Inc.*, 719 F.2d 23, 34 n.9 (2d Cir. 1983), *Amato v. City of Saratoga Springs, N.Y.*, 170 F.3d 311, 323 (2d Cir. 1999) (Jacobs, J. concurring), RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. e (1982)); *see also* CORPUS JURIS SECUNDUM, JUDGMENTS § 797 ("Although a default judgment is entitled to res judicata or claim preclusive effect, the doctrine of collateral estoppel, or issue preclusion, does not apply in the context of a default judgment because nothing was actually litigated.").

*Executor, Estate of Celia Kates v. N. Trust Bank, N.A.*, No. 05-CV-6311, 2006 WL 3253079, *1 (2d Cir. Nov. 8, 2006) (same); *Com Cor Holding, Inc. v. F.A. Tucker Transmission Co.*, 93 Civ. 8440, 1998 WL 283348, at *3 (S.D.N.Y. June 1, 1998) (same). *Res judicata* applies to administrative adjudications like the EPA proceeding in the present case, *see Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991), as well as to default judgments. *See Morris v. Jones*, 329 U.S. 545, 550-51 (1947); *Saud*, 929 F.2d at 919; *Com Cor Holding*, 1998 WL 283348, at *3 n.2. Furthermore, while it typically prevents a plaintiff from suing on a claim that already has been decided, it also prevents a defendant from raising any new defense to defeat the enforcement of an earlier judgment. *See Curtis v. Citibank, N.A.*, No. 05-CV-6552, 2006 WL 3253049, at *1 (2d Cir. Nov. 8, 2006); *Com Cor Holding*, 1998 WL 283348, at *3. "Whether . . . the first judgment will have [this] preclusive effect depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." *Saud*, 929 F.2d at 919 (emphasis removed); *see also D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 112 (2d Cir. 2006) ("The first judgment will preclude a second suit only when it involves the same transaction or connected series of transactions as the earlier suit." (internal quotation marks omitted; internal citations omitted)).

In the present case, any defense that defendant could now raise to plaintiff's request for the assessment of civil penalties and injunctive relief, as previously ordered in the Default Orders, could have been raised at the administrative hearing. It is axiomatic that *res judicata* "extends not only 'to every matter which was offered and received to sustain or defeat the claim or demand, but [also] to any other admissible matter which might have been offered for that purpose.'" *See Com Cor Holding*, 1998 WL 283348, at *3 (internal quotation marks omitted) (quoting *Maharaj v.*

13

*Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997)).  Defendant's failure to raise any such defense, and the subsequent adjudication of the issue at the administrative level, precludes further litigation of this matter.  *See Com Cor Holding*, 1998 WL 283348, at *3 (applying *res judicata* in a subsequent action to the defendant's defense which he failed to raise in a prior proceeding in which a default judgment was entered against the defendant).  Indeed, if this court were to disturb the ALJ's findings, it would reward one who has ignored federal administrative orders and forced a subsequent enforcement proceeding in federal district court.  Clearly, this result is unacceptable, and precisely why "[a] default judgment has the same preclusive effect as any valid final judgment."  *Id.*[10] Accordingly, we impose against defendant civil penalties in the amount of $80,317 and order him to comply with all applicable EPA requirements regarding underground storage tanks.[11]

Next, we must consider plaintiff's request to assess additional civil penalties against defendant, first, pursuant to 42 U.S.C. § 6991e(a)(3) for his persistent noncompliance with the ALJ's Default Orders and, second, pursuant to 42 U.S.C. § 6991e(d)(2) for his failure to provide

---

[10] Even if *res judicata* did not apply to the present case, we would nonetheless adopt the Default Orders to the extent it assessed civil penalties against defendant in the amount of $80,317 and ordered him to comply with all applicable EPA requirements regarding underground storage tanks.  We find that the ALJ's decision properly considered the applicable statutory and regulatory framework and all other relevant factors, including the seriousness of defendant's violation, defendant's background and defendant's efforts to comply with the applicable requirements.  *See* 42 U.S.C. §§ 6991e(c), 6991e(e).

[11] Although we order defendant to comply with all applicable EPA requirements regarding underground storage tanks, which will be outlined in more detail *infra*, defendant has represented to the Court that both tanks are now nonoperational.  Accordingly, defendant may comply with this portion of our order by permanently closing the tanks in accordance with 40 C.F.R. §§ 280.70-74.

information in response to the EPA's "Request for Information."[12]  42 U.S.C. § 6991e(a)(3) provides

that in the event that a violator fails to comply with an order under the RCRA, "he shall be liable for

a civil penalty of not more than $25,000 for each day of continued noncompliance."   Section

6991e(d)(2) provides that "[a]ny owner or operator of an underground storage tank who fails to

comply with . . . any requirement or standard promulgated by the Administrator . . . shall be subject

to a civil penalty not to exceed $10,000 for each tank for each day of violation."   Plaintiff seeks

penalties under § 6991e(a)(3) in an amount not to exceed $32,500[13] for each day of defendant's

continued noncompliance with the Default Orders and penalties under § 6991e(d)(2) in an amount

not to exceed $11,000[14] per tank per day for defendant's failure to provide information pursuant to

the EPA's "Request for Information."   Since plaintiff has not complied with the Default Orders for

approximately 825 days, and the information requested pursuant to the EPA's "Request for

Information" is approximately 700 days outstanding,[15] plaintiff seeks, in total, an amount not to

---

[12] While we conclude that *res judicata* precludes this Court from disturbing the ALJ's findings with respect to the civil penalties of $80,317 and injunctive relief, the doctrine is inapplicable to plaintiff's request for additional civil penalties as a result of defendant's noncompliance with the Default Orders and the EPA's "Request for Information."  The latter arises from a different series of occurrences and therefore does not constitute the same claim as asserted in the administrative hearing for purposes of *res judicata*.  *See St. Pierre v. Dyer*, 208 F.3d 394, 400 (2d Cir. 2000).

[13] Although § 6991e(a)(3) provides for a penalty of $25,000 per day for noncompliance with the EPA's final administrative order, this amount has been adjusted for inflation, pursuant to 40 C.F.R. § 19.4, and is, at present, $32,500.

[14] This amount also reflects adjustments for inflation pursuant to 40 C.F.R. § 19.4.  *See supra* p. 15 n.12.

[15] Plaintiff appropriately calculates the amount of days that the requested information is outstanding from January 10, 2005, *i.e.*, the first weekday after the deadline for responding to the "Request for Information."  (*See* Complt. ¶ 91.)  This amount is then multiplied by the amount of tanks into which the EPA inquired through its "Request for Information."  *See* 42 U.S.C. §

exceed approximately $42,212,500. The actual amount of the fine, within the statutory framework, is left to this court's sound discretion. In assessing the appropriate penalties, we have considered a variety of factors, including the seriousness of the violation, defendant's financial situation and any good faith effort to comply with the applicable requirements. *See* 42 U.S.C. §§ 6991e(c), 6991e(e). We will first assess penalties under § 6991e(a)(3) for defendant's failure to comply with the Default Orders.

Considering all the present circumstances, we find that a relatively *de minimis* penalty, in addition to the civil penalties in the amount of $80,317 and appropriate injunctive relief, to be appropriate. Plaintiff does not dispute that neither of defendant's underground storage tanks has never actually leaked and both are nonoperational. Thus, while defendant must promplty comply with the applicable EPA requirements, it appears up to the present that he has caused no environmental damage. Additionally, defendant has represented to this Court, and plaintiff has not shown otherwise, that he has few assets with which to satisfy a judgment and has incurred significant expense to date as a result of the EPA's investigation and prosecution of this matter. Accordingly, we believe that a fine of $80,317, combined with the cost of future compliance with applicable law, is sufficient to deter defendant from future wrongdoing. Additional penalties could very well prevent defendant from complying with the applicable EPA regulations as a result of the additional financial burden. Indeed, defendant's compliance with the EPA's requirements at his own expense is the paramount objective here. Although plaintiff emphasizes that we should assess additional penalties in order to "send a message to the regulated community," we find that doing so under the present circumstances would be fruitless or even counterproductive. In any event, plaintiff fails to provide

---

6991e(d)(2).

16

this Court with any guidance as to the appropriate amount of penalties and merely points out that, under applicable law, *up to* approximately \$42,212,500 could be assessed against defendant.

Obviously, any such judgment would not only be spectacularly draconian, but uncollectible. On the other hand, the government notes that if we were to impose no additional penalties, defendant would effectively receive no penalty whatsoever for his noncompliance with the Default Orders. This is undeniable. Accordingly, we assess an additional penalty of \$9,364.14 under 42 U.S.C. § 6991e(a)(3),[16] raising the total amount of civil penalties to \$89,681.14.

Lastly, in assessing penalties under § 6991e(d)(2) for defendant's failure to furnish the requested information as requested by the EPA's "Request for Information," we assess a civil penalty in the amount of \$1. We believe that the penalties already assessed are sufficient to deter further violation of the applicable laws, and we find it unnecessary to further penalize defendant for his failure to reply to the EPA mailings. In light of the nature of this particular violation, the issuance of appropriate injunctive relief, the civil penalties in the amount of \$89,681.14 and defendant's troubled financial status, we conclude that a *de minimis* penalty of \$1 is appropriate for defendant's failure to furnish the information requested by the EPA in violation of 42 U.S.C. § 6991d.

**CONCLUSION**

Accordingly, the United States government's motion for default judgment against defendant Salvatore DiPaolo, Jr., as to liability, is granted. It is ordered that defendant pay civil penalties in

---

[16] This is equivalent to a five percent annual interest on \$80,317 over 825 days, or the time from August 29, 2004, when defendant was required to make payment under the Default Orders, to the December 1, 2006 Order to Show Cause Hearing.

the amount of $80,317, pursuant to 42 U.S.C. § 6991e(d)(2), as previously assessed in the final administrative order of the Environmental Protection Agency (the "EPA"). It is further ordered that defendant pay civil penalties in the amount of $9,364.14, pursuant to 42 U.S.C. § 6991e(a)(3). It is further ordered that defendant pay civil penalties in the amount of $1, pursuant to 42 U.S.C. § 6991e(d)(2). Thus, the total amount of civil penalties assessed against defendant and which defendant is obligated to pay is $89,682.14.

Additionally, it is ordered that defendant as promptly as is practicable: (1) comply with all applicable release detection requirements set forth in 40 C.F.R. Part 280, Subpart D for all underground storage tank systems ("UST") owned and/or operated by defendant; (2) comply with all applicable requirements of 40 C.F.R. §§ 280.20-21 for all USTs owned and/or operated by defendant; and (3) comply with all other applicable requirements of 40 C.F.R. Part 280 for all USTs owned and/or operated by defendant. As an alternative to compliance with Orders (1) - (3), it is ordered that defendant immediately cease operation of and promptly and permanently close all USTs owned and/or operated by defendant in accordance with 40 C.F.R. §§ 280.70-74.

It is further ordered that defendant promptly furnish to the EPA the information requested by the EPA pursuant to its "Request for Information," as required under 42 U.S.C. § 6991d and 40 C.F.R. Part 280.34.

SO ORDERED.

Dated: White Plains, New York
       December 15, 2006

_William C. Conner_
Sr. United States District Judge

18